**A. Thomas OSWALT, Jr., Appellant,**

v.

**COUNTY OF RAMSEY and City of New Brighton, Respondents.**

**No. C3–84–1619.**

Court of Appeals of Minnesota.

July 16, 1985.

Review Denied Sept. 26, 1985.

Nancy C. Dreher, Robert L. DeMay, Minneapolis, for appellant.

John F. Bannigan, Jr., St. Paul, Frederick C. Brown, Fred L. Morrison, Minneapolis, for respondents.

Heard, considered and decided by WOZNIAK, P.J., and NIERENGARTEN and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

In a suit against the City of New Brighton and the County of Ramsey, appellant claimed negligence, nuisance, trespass, intentional infliction of emotional distress, taking of property without compensation in violation of the federal and state constitutions and in derogation of 42 U.S.C. § 1983, and inverse condemnation.

After a jury trial, the court ordered judgment in favor of appellant and against Ramsey County in the amount of $35,000. This judgment was not appealed.

Appellant challenges a trial court order that judgment be entered in favor of New Brighton as to all claims. In advisory answers to interrogatories, a jury found the city liable to Oswalt for emotional distress and found damages in the amount of $30,-000.

We affirm in part and reverse in part and remand.

## FACTS

In 1975, appellant Oswalt and his wife purchased a mortgaged home in New Brighton. The house is located on an oversized, scenic lot. It is surrounded on three sides by a city park, with a large pond. A creek, Ramsey County Ditch No. 2, flows from the pond through the property. In 1978, the New Brighton City Council adopted the Floodplain Management Ordinance. Because appellant's property was located in a floodway district lying within a

floodplain, it was a nonconforming use under the ordinance.

In 1980, appellant found that his property was caving in and the house was settling. The trees slanted over the driveway, a sinkhole appeared in the backyard, the kitchen floor became more and more slanted, and the basement floor sank. Appellant called Ron Nienaber, the building official for New Brighton, for advice. Using Nienaber's suggestion, Oswalt punched holes in the basement floor, and found air spaces underneath. Nienaber inspected the house several times, and on August 21, 1980, Oswalt was told his house would probably be condemned. Oswalt contacted various governmental units, the university, and engineers to find out what, if anything, he could do about the house. It was suggested that his problem might be due to the lowering of the water table.

On September 4, Nienaber hand delivered a letter to appellant, condemning the house because the gas pipes were under strain and could break; the walls had severe cracks and were not structurally sound; the basement floor was in danger of collapse; and the water pipes were under severe strain and might burst. A September 5, 1980 letter gave Oswalt options of removing the existing dwelling or repairing the dwelling to alleviate the reasons for condemnation. It further informed him that if he chose to repair it, he must comply with the floodplain ordinance, and must obtain a building permit.

Nienaber informed Oswalt several times that he thought damage to the house exceeded fifty percent of its value, so that repair of the house, a nonconforming use, could not be made under the floodplain ordinance. James Winkels, the director of community development and Nienaber's superior, advised appellant to apply for a building permit; he testified at trial that he never told appellant that his home could not be repaired. One real estate appraiser testified at trial that the market value of the house as of April 19, 1979, was $59,000. Another stated that the market value of the house in October 1982, disregarding the damage, was $69,200, and that the cost of repairing the damage was in excess of $35,-000.

On Monday, September 29, at 10:10 p.m., a uniformed New Brighton police officer came to appellant's house and said that he and his wife must leave or be fined. They left, and moved from place to place, using whatever accommodations they could find.

Oswalt began to suffer sleeplessness, nightmares and grinding of his teeth in his sleep. He began drinking. He became irritable, depressed and paranoid, and isolated himself from the relationship with his wife. He obtained treatment for chemical dependency and psychological counseling. Two treating psychologists testified that Oswalt, who had served as a medic in Viet Nam, had suffered from post-traumatic stress disorder from his Viet Nam experiences, but that he was fighting to regain a normal life. They testified that the loss of the house reactivated and aggravated many symptoms of the disorder.

In November 1981, Oswalt commenced this lawsuit. He defaulted on his mortgage, not being able to continue payments while paying rent elsewhere. By the date of trial, the mortgage had been foreclosed and the property resold for $6,500 to Gordon Hedlund. Hedlund, who works in the real estate field, and does remodeling, submitted a repair estimate of $11,827.74 and a valuation of the home of approximately $50,000 to the city, obtained a building permit, and repaired the house. He spent approximately $15,668.17, of which he estimated $12,368 was spent on restorative work. He did not include the value of his labor in the cost.

After a trial in 1984, the jury found that the negligence of the county in constructing the ditch caused damage to Oswalt's house in the amount of $35,000. It found in advisory interrogatories that Oswalt had established each element of the city's tort of intentional infliction of emotional distress, and that the sum necessary to compensate him was $30,000.

In its post-trial order, the trial court: (a) as to emotional distress, concluded that

there was insufficient evidence to find that the city acted intentionally or recklessly, that its conduct was extreme and outrageous, or that the mental distress Oswalt suffered was severe; (b) granted Oswalt's motion to include in his complaint a count for inverse condemnation, but found as a matter of law that there was no taking of his property in a constitutional sense, either by regulation or physical appropriation; (c) ordered entry of judgment in favor of Oswalt and against the county in the amount of $35,000; and (d) ordered that judgments be entered in favor of the city upon the complaint, including the inverse condemnation claim.

Oswalt appealed from the judgment entered in favor of the city.

## ISSUES

1. Did the city unconstitutionally take appellant's property?

2. Did the trial court properly find that the facts were insufficient as a matter of law to support appellant's claim of intentional infliction of emotional distress?

## ANALYSIS

1. Appellant contends that the city unconstitutionally took his property without just compensation, by condemning his property, by refusing to purchase his property pursuant to New Brighton, Minn., Code § 17–120(a)(8) (1978), and by repeatedly informing him that he could not make the repairs necessary to lift the condemnation.

---

**1.** The floodplains ordinance is constitutionally valid on its face, and constitutes a reasonable exercise of police power. The eventual elimination of nonconforming uses is clearly envisioned; without this action, land use planning could never be fully effective. *County of Freeborn v. Claussen*, 295 Minn. 96, 99, 203 N.W.2d 323, 325 (1972).

**2.** The ordinance subsection on reconstruction provides:

If any nonconforming use is destroyed by any means, including floods, to an extent of fifty (50) per cent or more of its assessed value, it shall not be reconstructed except in conformity with the provisions of this chapter. However, the city council may issue a special use permit for reconstruction if the use is located outside the floodway and, upon reconstruc-

---

U.S. Const. amend. V; Minn. Const. art. I, § 13.

■ New Brighton's floodplain ordinance was adopted pursuant to Minn.Stat. §§ 104.01–.07 (1978). Local governmental units are directed under this statute to:

adopt, administer, and enforce flood plain management ordinances, which shall include but not be limited to the delineation of flood plains and floodways, the preservation of the capacity of the flood plain to carry and discharge regional floods, the minimization of flood hazards, and the regulation of the use of land in the flood plain.

Minn.Stat. § 104.04, subd. 1 (1978).[1]

Under the ordinance, appellant's residence was located within a floodplain. The city floodplains area is divided into three districts; appellant's residence was the only home within a floodway district, the most restricted area. A residence is not included within the list of permitted uses or special uses allowed within a floodway district. New Brighton, Minn., Code § 17–040.

■ Because appellant's residence was present prior to the enactment of the ordinance, it could remain as a nonconforming use, but the ordinance prohibits reconstruction of a nonconforming use which is destroyed to an extent of fifty percent or more of its assessed value. New Brighton, Minn., Code § 17–120(a)(5).[2] This is typical

---

tion, is adequately floodproofed, elevated, or otherwise protected in conformity with section 17–110 d.6.
New Brighton, Minn., Code § 17–120(a)(5) (1978).
Appellant and respondent both contend that New Brighton, Minn., Code § 17–120(a)(2) applies; that subsection prohibits any structural alterations or additions to a nonconforming structure over the life of the structure exceeding fifty percent of its value. This is not a case in which alterations or additions to nonconforming structures are at issue; the case concerns destruction of a nonconforming use. The cost of repair of the house is not necessarily equal to the value of the extent of its destruction. *In re Commodore Hotel Fire & Explosion Cases*, 324 N.W.2d 245, 248 (Minn.1982).

treatment of nonconforming uses in zoning ordinances. *See, generally,* Annot., 57 A.L.R.3d 419 (1974).

■ An ordinance may constitutionally prohibit the creation of nonconforming uses, but "existing nonconforming uses must either be permitted to remain or be eliminated by use of eminent domain." *County of Freeborn v. Claussen,* 295 Minn. 96, 99, 203 N.W.2d 323, 325 (1972).

■ Ordinances need not allow such nonconforming uses to expand or enlarge.[3] "The public policy behind that doctrine is to increase the likelihood that such uses will in time be eliminated due to obsolescence, exhaustion, or destruction. This in turn will lead to a uniform use of the land consistent with the overall comprehensive zoning plan." *Id.*

■■ Acting under an appropriate ordinance, a municipality may determine the useful life for a nonconforming use and require that it cease at the end of that life. *Naegele Outdoor Advertising Co., Inc. v. Village of Minnetonka,* 281 Minn. 492, 501, 162 N.W.2d 206, 213 (1968). If this "amortization" period is "reasonable," the action can be taken without compensation. *Id. See Klicker v. State,* 293 Minn. 149, 152, 197 N.W.2d 434, 436 (1972); Annot., 22 A.L.R.3d 1134, 1139–41 (1968). Section 17–120 of the New Brighton ordinance includes an amortization provision.[4]

Here the city asserts that it engaged in no taking, no action that could serve as a basis for a duty to compensate appellant. In its order refusing relief on appellant's claim of inverse condemnation, the trial court agreed:

> Defendant, New Brighton * * * appropriately determined that Plaintiff's home was unfit for human habitation pursuant to the Hazardous and Substandard Buildings Act (Minn.Stats. 463.15, et seq.). No determination was made nor did Plaintiff ever seek one that his home was incapable of being brought into conformity with the standards contained within the New Brighton Floodplain Management Ordinance. On the facts as adduced at trial this court finds as a matter of law that there was no taking in a constitutional sense of Plaintiff's property and/or of his rights therein either by regulation (see *McShane v. City of Faribault,* 292 N.W.2d 253 [Minn.1980]) or by physical appropriation (see *Alevizos v. Metropolitan Airports Commission of Minneapolis and St. Paul,* 298 Minn. 471, 216 N.W.2d 651 [1974] and *Spaeth v. City of Plymouth,* 344 N.W.2d 815 [Minn.1984]).

As the trial court observed, the city acted in September 1980 under the state statute on hazardous buildings, not under the floodplain ordinance. It took no formal steps under its floodplain ordinance. `

---

**3.** A limit on repairs of partially destroyed structures is an approved method for elimination of nonconforming uses. *Zalk & Josephs Realty Co. v. Stuyvesant Insurance Co.,* 191 Minn. 60, 64, 253 N.W. 8, 11 (1934). In effect, the owner of a nonconforming structure, which is destroyed to the extent provided in the ordinance, becomes the owner of unimproved property, and the use of that property may be restricted without denial of due process. *See Service Oil Co. v. Rhodus,* 179 Colo. 335, 348, 500 P.2d 807, 814 (1972).

Because we conclude here that the municipality took a nonconforming use improperly, we do not reach the question whether a floodplain management ordinance represents the enterprise function of municipal government, where a limit on repairs may constitute a taking. *See McShane v. City of Fairbault,* 292 N.W.2d 253 (Minn.1980).

**4.** The ordinance provides:

> Nonconforming uses located in the Floodway District shall be eliminated or brought into conformity with the standards contained in this chapter within a reasonable period of time as determined by the city council, after a hearing for each such nonconforming use. The council shall make its determination upon the basis of the normal useful life of any improvement upon the premises. In addition, the monetary value of any competitive advantage derived by the operation of such nonconforming use, by reason of the limitation on establishment of competing businesses as a result of this chapter, shall be considered as a reduction of losses resulting from the requirement of termination of the use under this chapter.

New Brighton, Minn., Code § 17–120(a)(8) (1978).

More particularly, the trial court correctly observed that the city made no "determination" that appellant's house was damaged to an extent such that reconstruction was prohibited under subsection 5 of Code § 17–120(a). Appellant never applied for a building permit.

In addition, the city took no action under the amortization provision in the floodplain ordinance, subsection 8 of Code § 17–120(a).

■ We must accept the trial court's findings of fact unless they are clearly erroneous. Minn.R.Civ.P. 52.01. On the other hand, the interpretation of zoning ordinances is a question of law that we must review independently. *Frank's Nursery Sales, Inc. v. City of Roseville*, 295 N.W.2d 604, 608 (Minn.1980). We conclude that there was a taking, without a decision on the useful life of the improvement, and that the trial court erred as a matter of law in refusing appellant an award of damages for inverse condemnation.

■ Under New Brighton, Minn., Code § 17–120(a)(8), the city established a procedure for eliminating a nonconforming use. The ordinance required a hearing and a "determination" of the useful life of an improvement. If the use was eliminated before the end of its useful life, reasonably determined, compensation would be due. *See Naegele*, 281 Minn. at 501, 162 N.W.2d at 213. A damaged nonconforming use has no useful life if damage is to an extent such that repair is prohibited by ordinance,[5] but this rule of law also depends on a proper determination of facts by the municipality.

■ The city chose instead to eliminate the use under an unrelated statute, Minn. Stat. § 463.15–.26. Condemnation under those laws also involves a process that might avoid an unlawful taking. The initial municipal action is in the form of a demand for correcting the hazardous condition. Minn.Stat. § 463.16. Here appellant was given a notice demanding repair as an alternative to removal.

Under some circumstances, the demand for repair might lead to a determination of the extent of damage, or default of the owner for failing to respond. Here, however, the notice was accompanied by an express demand that repairs comply with the floodplain ordinance. The city used force under a law on safety hazards, but it effectively applied a standard enacted as part of the floodplain ordinance. It used that standard without the determination it would necessarily make if it exercised force openly under the ordinance. New Brighton, Minn., Code 17–120S(a)(8).

■ New Brighton contends that the hazardous building procedure transfers from the municipality to the landowner a responsibility to seek an official determination about the useful life of the improvement. We do not agree. Neither reason nor precedent permits us to approve this proposed means to avoid recognized obligations of the municipality in dealing with a nonconforming use. Moreover, the argument is especially unconvincing in a case where a municipal official repeatedly told the landowner that he could not get a permit for repairs.

■ Because the trial court concluded that the city did not act, that appellant forfeited his property by failing to seek a building permit, it held appellant responsible for the absence of a decision whether he could repair the house. We conclude that this decision is founded on an error of law and is unjust to the property owner.

2. Did the trial court properly decline to award damages for emotional distress? The jury found, in advisory interrogatories, that the city acted intentionally or recklessly, constituting extreme and outrageous conduct, causing appellant emotional distress, and that the emotional distress caused was severe. The trial court, which allowed the question to go to the jury in an advisory fashion only, found the evidence insufficient to support the findings of intentional or reckless conduct, extreme and

---

**5.** *See* footnote 3.

outrageous conduct, or severe emotional distress. The court found that the incident "caused the Plaintiff that type of emotional distress which would normally and naturally flow from such an incident regarding one's homestead."

 In *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428 (Minn. 1983), the supreme court recognized the tort of intentional infliction of emotional distress, and listed four elements of proof necessary to sustain a claim:

> (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe.

*Id.* at 438–39. The operation is sharply limited to cases involving particularly egregious facts. *Id.* at 439. We find that the facts of the case do not rise to the kind of extreme and outrageous facts which constitute intentional infliction of emotional distress. We affirm the trial court's finding that appellant has not presented facts which arise to that tort.

Appellant also claims he is entitled to compensation for emotional distress as part of his inverse condemnation claim. There is no precedent to extend condemnation relief beyond compensation for the value of property taken. Moreover, the narrow standard for distress claims has not been enlarged due to recovery of damages on another cause of action. *See Eklund v. Vincent Brass and Aluminum Co.*, 351 N.W.2d 371, 378–79 (Minn.Ct.App.1984), *pet. for rev. denied*, (Minn. Nov. 1, 1984).

3. Appellant claimed a cause of action under federal law as an alternative to his claim of a taking under state law. Because we conclude he has a remedy under state law, we do not address the alternative claim.

## DECISION

Appellant is entitled to compensation for the taking of his property, measured by its value at the time of the taking. The case is remanded for determination of the appropriate amount of compensation. The trial court correctly refused his other claims for relief from the City of New Brighton.

Affirmed in part and reversed in part and remanded.