Martin J. BAHL, Linda C. Bahl, and
Terrence G. Bahl, Appellees,

v.

The CITY OF ASBURY, Iowa and
the City Council of the City of
Asbury, Iowa, Appellants.

No. 01–1355.

Supreme Court of Iowa.

Dec. 18, 2002.

Rehearing Denied Feb. 7, 2003.

Stephen J. Juergens of Fuerste, Carew, Coyle, Juergens & Sudmeier, P.C., Dubuque, for appellants.

Brian J. Kane of Kane, Norby & Reddick, P.C., Dubuque, for appellees.

TERNUS, Justice.

The determinative issue in this case is one of statutory interpretation: does Iowa Code section 414.28A (1999) require that a city treat land-leased communities of manufactured housing the same as similar communities of site-built housing or does this statute merely require that a city allow land-leased communities of manufactured housing somewhere within the city limits? The district court held that section 414.28A requires equal treatment of manufactured housing developments and similar site-built housing projects. On the basis of this interpretation of the statute, the court ruled that the zoning ordinance of the appellee, City of Asbury, violated sec-

tion 414.28A by relegating land-leased communities to R–4 zoning districts only when they contain manufactured homes. The court further held that the appellee, City Council of the City of Asbury, Iowa, acted illegally in denying a rezoning application filed by the appellants, Martin J. Bahl, Linda C. Bahl, and Terrence G. Bahl, because the Bahls planned to build a land-leased community of manufactured homes on their property.

The City and its council, sometimes hereinafter referred to jointly as the city, appealed. The City presents one issue for review: a claim that "the district court erred in concluding that, by restricting mobile home parks to R–4 districts ...,  the city zoning ordinance violated section 414.28A." We think the district court correctly ruled that the Asbury zoning ordinance violates state law. Therefore, we affirm the district court judgment in favor of the property owners.

I. *Background Facts and Proceedings.*

The Bahls own property located in the city limits of Asbury, Dubuque County, Iowa. In 1997, they submitted a request to rezone their property from A–1 (agricultural) to R–4 (high density residential) to allow for the construction of a manufactured housing development. Rezoning was necessary because the Asbury city zoning ordinance allowed "mobile home parks" only in R–4 districts.[1]

---

1. The City's zoning ordinance defines the term "mobile home park" in part as a "tract of land upon which two (2) or more occupied mobile homes are harbored, either free of charge or for revenue purposes." This definition tracks the statutory definition of "land-leased community," which is defined, in part, as "a tract of land under common ownership upon which ten or more occupied manufactured homes are harbored, either free of charge or for revenue purposes." Iowa Code § 414.28A. A "manufactured home" is de-

fined in chapter 414, in part, as "a factory-built structure, which is manufactured or constructed under the authority of 42 U.S.C. § 5403." *Id.* § 414.28. Under the ordinance, a "mobile home" includes "[a] factory-built structure manufactured or constructed under the authority of 42 U.S.Code, presently Section 5403."

The parties do not dispute that the development proposed by the Bahls is a land-leased community of manufactured housing within

The Bahls' application proposed a phased development of manufactured homes known as Oak Meadows. The request for rezoning was supported by plans, drawings and other pertinent information. The plans submitted with the application showed the overall character of the development as well as anticipated landscaping, including evergreen screening on the perimeters of the property. Proposed development conditions for Oak Meadows, which set appearance standards and provided for methods of enforcement, were also set forth. Finally, the Bahls' application contained detailed specifications and photographs of the types of manufactured housing and mobile homes that would be permitted in the development, with none over three years old being allowed.

The City's planning and zoning commission held a public hearing in June 1998 on the application. *See generally* Iowa Code § 414.6 (providing for city council's appointment of a zoning commission to recommend changes in zoning district boundaries to the council). Opposition to the proposed "trailer park" was nearly universal. There was concern that the development would lower property values and ruin the beauty of the area. Some members of the public who spoke at the hearing expressed stereotypical views. A retired school principal asked whether the citizens of Asbury wanted their children to go to school with kids from a "trailer court"? He said, "[Trailer court kids] come to school with a lot of baggage. I know from experience. These kids tend to be hyperactive and easily distracted. Mainly, it's due to the confinement. They are confined in these small little houses for long periods of time. You let them out in the open spaces and they are going to run." Another person commented that the road fronting the development would "be a drag way all of the time" if the proposed plan were allowed. The predominant sentiment appeared to be "not in my back yard."

The commission ultimately tabled the Bahls' request pending adoption of a new land use plan. Because the Bahls' farm had only recently been annexed into the City, the City's land use plan did not include their property. The commission decided to defer action until it had the recommendation of the city's land use advisor with respect to the overall zoning plan for the area encompassing the land at issue.

In November 1998, an updated land use plan prepared by an outside consultant was presented to the commission. At that time the proposed plan showed the Bahls' property as R-4, a designation that would permit manufactured housing developments. Again, opposition was widespread and again it was focused on the location of a manufactured housing community on the Bahls' property. The dominant view was that the City of Asbury did not need that type of housing. Repeated references were made to a recent housing study done at the city council's request that recommended demolishing the only trailer park in the city and creating upper-end, single-family housing. Speakers relying on the housing study emphasized that the study did not recommend the construction of trailer parks. Several residents pointed out the "upper-end" character of the city and its housing. In line with these observations was the statement of one person who cited statistics from the housing study that "Asbury has 58% higher median household income, 36% higher average household income, and 5% higher per capita income than the state" and that "[t]he percent of families and people living below the poverty level in Asbury is significantly

the meaning of chapter 414. Nor do they dispute that the Bahls' project is subject to the restrictions imposed on mobile home parks by the City's zoning ordinance.

lower than that of the county and the state."

Another citizen claimed the Asbury "blood line" was R–2 and asked why couldn't Asbury continue just as it had? A later speaker expressed a similar feeling: "We like this community the way it is." Assertions were also made that individuals who wanted to live in a mobile home park could live in Dubuque, but they didn't need those things "right here in Asbury." This sentiment was echoed by a subsequent resident who said that if people want to live in that type of housing, "then let them live in Dubuque." Many questioned whether there was a need for *any* R–4 districts in the community, regardless of location. One person said, "My first feeling is I don't believe this community needs to have that type of zoning. I understand the political structure and that if a community needs to have it, then it ought to be in a certain place. . . . It probably deserves to be more down ... towards the industrial area." At the end of the hearing, a man accurately summarized the prevailing feeling: "I don't think there is one person here that is opposed to anything but trailer parks. I don't think anybody in this room wants trailers." Not surprisingly, a member of the commission then moved to amend the proposed plan in one particular: to change the zoning designation of the Bahls' farm from R–4 to R–3. After the unanimous approval of the amendment, the commission voted to recommend the new land use plan to the city council.

Two months later the city council met to consider adoption of the plan. The Bahls' attorney spoke at that meeting and urged the council to reconsider the proposed specification of the Bahls' property as R–3. He pointed out that the housing study had indicated a need for "housing for young families." He observed the same study stated that 75% of the houses in Asbury were valued at $100,000 or more, and 100% of the homes currently for sale had an asking price in excess of $100,000. Noting that such homes were not within the financial reach of many young people, the Bahls' attorney argued that the proposed manufactured housing development "would address the need for affordable housing" and "the need for housing for a variety of living environments," such as "low-to-moderate income housing, first-time homebuyers, and retirement [housing]." Notwithstanding these comments, the new land use plan was unanimously approved, including the designation of the Bahls' property as R–3.

Thereafter, in March 1999, the commission met to consider the Bahls' 1997 application to rezone their property to R–4. Despite the recently adopted land use plan showing this property as R–3, the commission voted to recommend to the council that the Bahls' rezoning application be granted. Notwithstanding this favorable recommendation, the city council denied the Bahls' request, concluding that R–4 zoning was not consistent with the City's land use plan. The Bahls thereafter filed an amended rezoning application that, among other changes, reduced the density of housing in the proposed development. This time, the planning and zoning commission recommended denial of the application, and that was the ultimate decision of the city council.

The City's denial of the Bahls' rezoning applications successfully shelved the Bahls' plan to build a manufactured housing development on their land because such developments, as noted previously, are restricted to R–4 districts by the Asbury zoning ordinance. The City does not dispute the effect of the council's decision, acknowledging in its brief that under the City's zoning ordinance "trailer parks" are excluded from districts other than R–4.

Upon the denial of their second application for rezoning, the Bahls filed a petition for writ of certiorari in the district court, claiming the City acted illegally in several respects. *See generally* Iowa Rs. Civ. P. 1.1401–.1412 (governing certiorari actions challenging legality of action of board). One ground of illegality was a claim that the City's zoning ordinance required "that mobile home communities be placed only in R–4 districts," in violation of section 414.28A. The City answered, denying any violation of state law and claiming its denial of the Bahls' application was not "solely because the proposed structure(s) are manufactured homes."

The district court found that the City's exclusionary zoning ordinance lay at the heart of the council's decision to refuse rezoning of the Bahls' property. The court stated:

> If manufactured homes were by definition given an R–3 designation, plaintiffs would have been allowed to proceed with their development because this would have been consistent with the City's land use plan adopted on January 26, 1999. The only member of the city council who gave a reason for denying plaintiffs' second rezoning request on March 22, 2000, was Ms. Nancy Wilson who "indicated that she believed it did not conform or fit into our . . . plan. The council worked on that for a very long time and rezoning this to R–4 does not fit our land use plan and I still do believe that."

Based on its factual findings, the district court concluded that the City violated Iowa Code section 414.28A because one reason for denying the Bahls' rezoning request was the fact that "the [d]evelopment was a land-leased community of manufactured housing." Therefore, it granted the Bahls' petition for writ of certiorari and annulled the City's denial of their rezoning application. *See* Iowa R. Civ. P. 1.1411 (allowing reviewing court to sustain or annul board's action, but not to substitute a different or amended decision). This appeal followed.

## II. *Scope of Review.*

The standard of review for district court decisions in certiorari actions is the correction of errors of law. *See O'Malley v. Gundermann,* 618 N.W.2d 286, 290 (Iowa 2000). Factual findings made by the district court are binding on appeal "if supported by substantial evidence." *Id.*

## III. *Issues on Appeal.*

The City states in its brief that it "appeals only from the district court's holding that the City zoning ordinance violated section 414.28A." In the course of addressing this issue, the City does, however, complain of two factual findings made by the district court: (1) a purported finding that "the proposed development would qualify for the R–3 zoning classification" and (2) an implicit finding that the City's denial of the rezoning application was based upon the fact that the structures in the Bahls' development would be manufactured homes. Assuming these matters were adequately raised for review, we address them briefly before considering the validity of the City's ordinance.

## IV. *Challenged Factual Findings.*

A. *Conformance to R–3 requirements.* In ruling on the Bahls' petition for writ of certiorari, the court observed that "[t]he record is replete with facts which support the conclusion that plaintiffs' proposed development would qualify for the R–3 zoning classification." The City claims the proposed development did not meet the density requirements for R–3 districts and so would not have been permitted in that classification regardless of

the restrictions imposed upon manufactured housing projects.

We find it unnecessary to consider this contention because any dispute with respect to the density of the Bahls' project is not germane to the issue before us. As we discuss below, section 414.28A prohibits any ordinance that disallows land-leased communities if *one* of the reasons for disallowance is the fact the development contains manufactured housing. Here, as the City concedes, even if the development proposed by the Bahls met the density requirements for an R–3 district, the development would still have been disallowed because land-leased communities of manufactured homes are not permitted in an R–3 district. Consequently, whether the project otherwise met the requirements of that classification is not determinative of whether the zoning ordinance violates section 414.28A. Accordingly, even if the court's comment could be construed as a finding that the Bahls' project satisfied the density requirements for an R–3 district, that finding is not pertinent to the legality of the zoning ordinance challenged by the Bahls.

■ B. *Basis for City's denial.* With respect to the second finding disputed by the City—that the City's decision was based on the use of manufactured housing in the proposed development—we disagree with the City's contention that "[t]here is not a shred of evidence" to support this finding. To the contrary, the record is overflowing with evidence that the City's desire to preclude such housing in this area was at the very heart of the City's action. Prior to the hearings reviewed above, council members had indicated approval of the Bahls' plan to build a mobile home park as reflected by the council's approval in 1997 of a letter of intent in which the council agreed to "support rezoning of [the Bahls'] land after it has gone

through the annexation process to [R–4] for the development of a mobile home community." Later, the City's outside consultant who was hired to update the City's comprehensive plan suggested that the Bahls' property be designated as R–4, a designation that would permit a manufactured housing development. Even the planning and zoning commission initially recommended that the city council approve the Bahls' rezoning request. Nonetheless, the City, after hearing a public outcry against "trailer parks," specified the Bahls' land as R–3 in the City's land use plan and thereafter refused to rezone the property to R–4. Although several relevant considerations came up at the various hearings, the discussion was overwhelmingly focused on the use of manufactured housing in the proposed development. This scenario of events supports the district court's finding that the City relied on its exclusionary zoning ordinance to disallow the Bahls' project because it contained manufactured housing.

We turn now to the definitive issue.

## V. *Does the City's Zoning Ordinance Violate Section 414.28A?*

■ Section 414.28A, first enacted in 1997, currently provides in pertinent part:

A city shall not adopt or enforce zoning or subdivision regulations or other ordinances which disallow or make infeasible the plans and specifications of land-leased communities because the housing within the land-leased community will be manufactured housing.

Iowa Code § 414.28A; *see* 1997 Iowa Acts ch. 86, § 4. This statute is very similar to a related statute adopted by the Iowa legislature nearly twenty years ago. In 1984, the General Assembly passed a bill that added the following provision to chapter 414:

A city shall not adopt or enforce zoning regulations or other ordinances which disallow the plans and specifications of a proposed residential structure solely because the proposed structure is a manufactured home. . . .

1984 Iowa Acts ch. 1238, § 2 (codified at Iowa Code § 414.28 (1985)).[2]

There appears to be very little difference between section 414.28 and section 414.28A with respect to the operative language. The primary distinction of course is that section 414.28 applies to "residential structure[s]" whereas section 414.28A governs "land-leased communities." Section 414.28A is also broader in scope, prohibiting subdivision regulations, as well as general zoning regulations. Originally section 414.28A, like section 414.28, only prohibited ordinances that "disallowed" manufactured housing developments "solely because" the homes were manufactured homes. 1997 Iowa Acts ch. 86, § 4 (codified at Iowa Code § 414.28A (1998)). Section 414.28A was soon amended, however, to enlarge the prohibition by barring regulations or ordinances that "make infeasible" manufactured housing developments, as well as those that outright disallow such developments. 1998 Iowa Acts ch. 1107, § 16 (codified at Iowa Code § 414.28A (Supp.1998)). In addition to this change, section 414.28A was also amended to strike the word "solely," see id., again broadening the reach of the statute so as to eliminate the requirement that the disallowance or infeasibility occur only because manufactured housing is involved.

■ While the prohibitions of section 414.28A are even broader and stronger than those contained in section 414.28, the basic structure of the prohibitions are, nonetheless, identical, indicating similar legislative intent and, accordingly, calling for similar interpretation. See State v. Dann, 591 N.W.2d 635, 638 (Iowa 1999) (stating court should seek to harmonize later-enacted statute with existing statutes on the same subject matter); 2B Norman J. Singer, Statutes and Statutory Construction § 51.02, at 197–98 (6th ed.2000 revision) ("Unless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed in the same sense."). Therefore, it is instructive in our search for the meaning of section 414.28A to consider what the legislature intended when it enacted section 414.28.

Although there is no legislative history explaining the legislature's objective in adopting section 414.28, it appears this statute was enacted in response to a perceived crisis in the supply of affordable housing. See generally Brady v. City of Dubuque, 495 N.W.2d 701, 705 (Iowa 1993) (noting that contemporary circumstances may be considered as an aid to interpretation of a statute); Iowa Code § 4.6(2) (stating that "the court, in determining the intention of the legislature, may consider . . . [t]he circumstances under which the statute was enacted"). In 1981, then-president Reagan established the President's Commission on Housing to study the housing industry and make recommendations for national policy to address the housing recession caused by inflation and high interest rates. See Exec. Order No. 12,310, 46 Fed.Reg. 31,869 (June 16, 1981) (directing Commission "to develop housing . . .

---

**2.** A comparable law was enacted placing the same limitations on county zoning authority. 1984 Iowa Acts ch. 1238, § 1 (codified at Iowa Code § 358A.30 (1985) and now found at Iowa Code § 335.30 (1999)). Section 414.28A has a similar counterpart, prohibiting county zoning authorities from discriminating against land-leased communities containing manufactured homes. See Iowa Code § 335.30A.

options which strengthen the ability of the private sector to maximize opportunities for homeownership"); *see also* Proclamation No. 4988, 47 Fed.Reg. 46,837 (Oct. 19, 1982) (referencing the adverse impact on housing "from the twin afflictions of inflation and high interest rates" and the establishment of the Commission to study national housing policy).

One of the Commission's fundamental concerns was "the housing problems of low-income Americans," specifically the affordability of housing. Report of the President's Commission on Housing 3, 10–12 (1982). The Commission concluded that "[m]anufactured housing [was] a significant source of affordable housing for American families, particularly first-time homebuyers, the elderly, and low- and moderate-income families." *Id.* at 85. Nonetheless, it recognized that local action often impeded the ability of homebuyers from choosing this type of housing. *Id.* at 86. Therefore, the Commission recommended "removing zoning provisions that discriminate against manufactured housing." *Id.; see id.* at 203 ("States and localities should remove from their zoning laws all forms of discrimination against manufactured housing . . . ."); *see also* Proclamation No. 4988, 47 Fed.Reg. 46,837 (Oct. 19, 1982) (noting Commission's report "reaffirmed our national commitment to equal housing choice"). The following explanation was given in support of this recommendation:

Because of sharply rising housing costs, manufactured housing today offers many households their only option for homeownership. Indeed, in 1980, manufactured ("mobile") homes amounted to 29 percent of all single-family homes sold. The marketplace demand for mobile homes has come from improvements in the product as well as from a competitive price.

Despite the increasing attractiveness of manufactured housing, *local zoning laws continued to discriminate against mobile homes. In many localities, mobile homes are segregated into special areas, often in disadvantageous locations set aside as "trailer parks."*

There is an increasing recognition that the quality of manufactured housing has improved. Since 1976, manufactured housing has been built under a national code, supervised by HUD, setting health and safety requirements. Vermont, California, and Indiana have enacted laws precluding discrimination against manufactured homes. The Michigan Supreme Court last year struck down a zoning law because it violated the State constitution: "The *per se* exclusion of mobile homes from all areas not designated as mobile home parks has no reasonable basis under the police power, and is therefore unconstitutional."

Manufactured housing can be as safe and healthy as comparable site-built housing. Housing systems or components satisfying a nationally recognized model code similarly should not be excluded from use in a locality. *Exclusionary zoning provisions based on type of manufacture are arbitrary and unrelated to legitimate zoning concerns.*

Report of the President's Commission on Housing 203–04 (emphasis added). It was within this historical context that the Iowa legislature in 1984 adopted section 414.28.

Although this court has never interpreted section 414.28, Iowa's statute was discussed in a 1988 article appearing in Urban Lawyer. *See* Molly A. Sellman, *Equal Treatment of Housing: A Proposed Model State Code for Manufactured Housing*, 20 Urb. Law. 73, 84 (1988). Noting that one solution to the affordable housing problem is "state enabling legislation demanding

comparable or equal treatment of all forms of housing," *id.* at 81, the author observes, "Three states—Iowa, Minnesota, and Vermont—have enacted progressive codes encouraging the utilization of manufactured housing *by mandating equal treatment of all forms of housing,*" *id.* at 82 (emphasis added). The author makes a similar statement later in discussing Iowa's specific statutory provisions, noting again that they "mandate *equal treatment* of manufactured housing with site-built housing." *Id.* at 84 (emphasis added) (citing Iowa Code Ann. §§ 358A.30, 414.28 (West 1976 & Supp.1986)).

The same interpretation of Iowa's statute was made by another author in 1996, in a discussion of state legislation "prohibiting or restraining discrimination against manufactured housing." S. Mark White, *State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single–Family Shelter,* 28 Urb. Law. 263, 269 (1996). This writer also describes Iowa's statute as "equal treatment legislation." *Id.* at 270 & n. 35. He explains such statutes prohibit "discriminatory treatment between manufactured and site-built homes, but preserve for local governments the right to impose zoning standards and procedural requirements . . . on the same terms as site-built housing." *Id.* at 270.

We think the commentators are correct. The historical context in which section 414.28 was enacted indicates that the statute was intended to prevent local zoning authorities from discriminating against manufactured housing. The same purpose logically must be ascribed to section 414.28A. *See* 2B Norman J. Singer, *Statutes and Statutory Construction* § 51.02, at 176–78 (6th ed.2000 revision) (stating that when a new provision is enacted that relates to the same subject matter as previous statutes, "the new provision is pre-

sumed in accord with the legislative policy embodied in those prior statutes"). More importantly, this interpretation of the statute is most consistent with the language of section 414.28 as well as the language of section 414.28A. Section 414.28 prohibits discrimination by providing that plans for a residential structure cannot be disallowed solely because the proposed structure is a manufactured home. Similarly, section 414.28A mandates equal treatment for manufactured housing developments by stating that plans for a land-leased community cannot be disallowed (or even made infeasible) because the proposed community contains manufactured homes. Nothing in the language of the statute supports the City's contention that section 414.28A simply prohibits a municipality from totally excluding manufactured housing developments from the community.

The Vermont Supreme Court reached the same conclusion that we reach here when it interpreted similar legislation enacted in that state. *See In re Appeal of Lunde,* 166 Vt. 167, 688 A.2d 1312 (1997). In *Lunde,* the city's zoning regulations restricted mobile homes to certain locations, a restriction that was not placed on site-built homes. 688 A.2d at 1313. A mobile home owner claimed the city ordinance violated a Vermont statute providing that "no zoning regulation shall have the effect of excluding mobile homes . . . from the municipality, except upon the same terms and conditions as conventional housing is excluded." *Id.* (quoting Vt. Stat. Ann. tit. 24, § 4406(4)(A)). The Vermont Supreme Court rejected an argument that the statute "was intended to prevent municipalities from excluding mobile homes 'from the municipality,' but to allow restricting mobile homes to mobile home parks or to a particular zone." *Id.* at 1314. Rather, the court concluded, the legislature "intended municipalities to treat mo-

bile homes in the same manner as conventional housing." *Id.*

Although the Vermont statute is not worded precisely the same as Iowa's statute, it too is "equal treatment" legislation. *See* Sellman, *Equal Treatment of Housing: A Proposed Model State Code for Manufactured Housing,* 20 Urb. Law. at 82. The *Lunde* case is persuasive authority that "equal treatment" statutes prohibit ordinances that treat manufactured housing ·developments differently from conventional housing developments, even though manufactured housing developments are not entirely excluded from the municipality.

In summary, the plain language of section 414.28A, particularly when considered in the statute's historical context, reveals a legislative intent to require equal treatment of land-leased communities that are composed of manufactured homes with similar communities composed of site-built housing. Our interpretation of section 414.28A does not mean the City must allow mobile home parks in all zoning districts. Nor does it mean the City cannot regulate manufactured housing developments. The statute merely mandates that land-leased communities of manufactured housing be allowed in any district in which similar communities of site-built housing are allowed, under the same terms and conditions imposed on such developments containing traditional housing.

Turning to the facts of the case before us, we conclude the Asbury zoning ordinance contravenes section 414.28A by relegating "mobile home parks," not all condominium-type communities, to R–4 zoning districts. Without a doubt, this restrictive ordinance has made the Bahls' land-leased community infeasible because it contains manufactured housing, a clear violation of the statute. The facts of the present case present a ·classic example of exclusionary and discriminatory zoning regulations and decisions of the very type the President's Commission called on states to prevent. Moreover, the City's zoning ordinance is exactly the type of discriminatory treatment of manufactured housing projects our legislature intended to thwart when it enacted section 414.28A.

## VI. *Conclusion and Disposition.*

We agree with the district court's ruling that the Asbury zoning ordinance violates section 414.28A. Accordingly, we affirm the district court judgment annulling the City's denial of the Bahls' second rezoning application.

**AFFIRMED.**

All justices concur except STREIT, J., who dissents.

STREIT, Justice (dissenting).

I agree with the majority that the ultimate issue in this case is a matter of statutory interpretation. However, I respectfully disagree with the majority's interpretation of Iowa Code section 414.28A. The majority interprets section 414.28A to mean mobile home parks must be allowed in any district in which "similar communities of site-built housing are allowed." Given this interpretation, it concludes the Asbury ordinance is illegal under 414.28A because the ordinance assigns mobile home parks to the high-density residential district. The majority adds meaning to this statute where the .plain language shows it was not intended by the legislature.

The plain and unambiguous language of the statute is ignored under the guise of providing statutory interpretation. Where a statute is clear and unambiguous, resort to extrinsic aids is unwarranted. We need only look to the plain language of the statute to determine whether the ordi-

nance, in assigning mobile home parks to R–4 districts, violates section 414.28A. The statute provides, in part,

A city shall not adopt or enforce zoning or subdivision regulations or other ordinances which disallow or make infeasible the plans and specifications of land-leased communities because the housing within the land-leased community will be manufactured housing.

Iowa Code § 414.28A (1999). Before we examine the meaning of this section, we must look to the terms of the statute to determine its scope. Namely, we look to what is a "land-leased community" and what constitutes "manufactured housing."

Iowa Code section 414.28 defines a manufactured home as,

a factory-built structure which . . . is to be used as a place for human habitation, but which is not constructed or equipped with a permanent hitch or other device allowing it to be moved other than for the purpose of moving to a permanent site, and which does not have permanently attached to its body or frame any wheels or axles.

Iowa Code § 414.28. A land-leased community is "any site, lot, field, or tract of land under common ownership upon which ten or more occupied manufactured homes are harbored, either free of charge or for revenue purposes. . . ." Iowa Code § 414.28A. Given these statutory definitions, the simple reading of section 414.28A provides: a city shall not enforce zoning or subdivision regulations or other ordinances that prevent the construction of ten or more manufactured homes upon a site simply because the site will consist of factory-built, manufactured homes. By assigning mobile home parks to R–4 districts, the ordinance does allow—and does not disallow or make infeasible—the construction of mobile home parks in the City. The statute contains no other language of limitation upon

the actions of a city in regulating the development of land-leased communities.

The plain language of this section supports the conclusion that it protects land-leased communities only in so far as a municipality cannot ban mobile home parks from its districts. The statute makes it illegal for a municipality to reject or make infeasible a proposed land-leased community because it will contain manufactured housing, including mobile home parks. This statute protects manufactured homes in a limited fashion because the City still has power to regulate or place reasonable restrictions upon manufactured housing developments. *See Huff v. City of Des Moines*, 244 Iowa 89, 94, 56 N.W.2d 54, 57 (1952) (regulation and restriction of mobile home parks is a "legitimate exercise of police power").

None of the language of this statute indicates that in order to comply with the section a city must allow mobile home parks in more than just the R–4 district. This section does not say the ordinance must allow mobile home *parks* in *every* zoning district. It does not say the ordinance must subject mobile home parks to the same conditions as it does all other "similar communities of site-built housing." It does not act as an absolute prohibition on the City's power to regulate the land under its control simply because a mobile home park is involved.

The majority avoids the simple reading of the statute and instead engages in an analysis of clear and unambiguous language. It attempts to characterize section 414.28A as a non-discriminatory or "equal treatment" statute that protects the civil rights of mobile home park developers. It does this by making a comparison between mobile home parks and "site-built houses in land-leased communities." Such a creature does not exist under this statute. The plain meaning does not support the

majority's conclusion that the legislature intended that mobile home parks be treated in the same fashion as are site-built homes in similar communities. Rather the statute does nothing more than prevent a city from outright prohibiting mobile home parks.

The majority contends its holding does not mean the City must allow mobile home parks in *all* zoning districts, but only in some. Despite this declaration, it is not clear where the City can limit the placement of mobile home parks. In fact, the inescapable conclusion from the majority's opinion is that the City of Asbury must allow mobile home parks to be constructed in any and all of its districts. Such a result is beyond both the force of section 414.28A's prohibition and the legislative intent behind this statute.

The Asbury ordinance has not disallowed Bahls from building this mobile home park. It has not made Bahls' plan infeasible. Rather, Bahls are free to build it in the area in which mobile home parks are permitted, i.e. R–4. To arrive at the majority's result, section 414.28A would need to have an additional sentence reading, "A city shall not impose restrictions or conditions upon a land-leased community comprised of manufactured housing which are different than those imposed upon site-built housing in similar communities." Because the statute does not mention site-built housing, its application is restricted to factory-built, manufactured homes.

In general, Iowa Code sections 414.28 and 414.28A are exceptions to the general zoning authority of a city.

> A fundamental rule of statutory construction is that an exception in a statute, contrary to its general enacting clause, should be strictly construed and all doubts and implications should be resolved in favor of the general provision or rule rather than the exception.

*Menke Hardware, Inc. v. City of Carroll,* 474 N.W.2d 579, 580 (Iowa 1991). Because we must strictly construe these exemption statutes, we may not read into section 414.28A a requirement that the City must allow mobile home parks in every zoning district in which all other land-leased communities are allowed.

A municipality has authority to regulate the area of land within its control. Iowa Code § 414.1. Iowa Code section 414.1 expressly grants cities the power

> to regulate and restrict the heights, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures, and land for trade, industry, residence or other purposes.

Such regulation is intended to promote the public health, comfort, safety, and welfare, including the maintenance of property values. *Plaza Recreational Ctr. v. Sioux City,* 253 Iowa 246, 251–52, 111 N.W.2d 758, 762–63 (1961). Derived from this general zoning authority, the City has authority to regulate and restrict mobile home parks as a "legitimate exercise of police power." *Huff,* 244 Iowa at 94, 56 N.W.2d at 57.

> Although mobile homes may serve a residential use, they are sufficiently different from other types of housing so that there is a rational basis for placing different requirements upon them. Thus, it is within the legislative discretion of a township to place mobile homes in other than purely residential districts, although the restrictions placed on mobile homes cannot amount to exclusionary zoning.

83 Am.Jur.2d *Zoning and Planning* § 254, 220–21 (1992).

Given the City's general zoning authority, it assigned mobile home parks to R–4 zoned districts. In contrast, an individual mobile home may be placed in any zoning district under the ordinance. Mobile home parks are assigned to R–4 districts because of their high density. I would find the district court erred in finding that the City, by assigning mobile home parks to R–4 districts, made them high density by definition. In sum, the ordinance permits mobile homes, including manufactured homes in *all* zoning districts. It restricts the parks to R–4 districts. Because the ordinance does not ban the development of mobile home parks from all zoning districts, it is not in violation of Iowa Code sections 414.28 and 414.28A.

I also disagree with the majority's finding that the city council denied Bahls' application for rezoning based upon the fact that the proposed development consisted of mobile homes. The majority bases its conclusion upon one factor only—the inflammatory comments of neighbors regarding the proposed mobile home park. Based only upon the neighbors' offensive language, the majority impermissibly ascribes bad motive to the city council's denial of Bahls' petition for rezoning. Other than the odious and sometimes loony comments themselves, there is no evidence in the record to indicate the city council made its decision based on the neighbors' comments.

All of the evidence considered by the city council indicates its decision to deny the application for rezoning was based on the same considerations the city council would apply to all other applications for rezoning. The ordinance states the regulations set by the ordinance shall apply uniformly to each class or kind of structure on land. There are no exceptions to this rule. The ordinance specifically provided the proposed project must comply with the City's long-range comprehensive plan. *See* ordinance § 3–13.4(1)(D). The evidence shows several grounds upon which the city council could have concluded the proposed project did not comply with the comprehensive plan and ordinance. Among the evidence presented to the city council, a professional city planner, two subdivision developers, a home builder, and a professional realtor addressed this particular rezoning issue. The following are the considerations upon which the city council could have denied the Bahls' rezoning request.

First, the city council considered the overall size and density of the proposed development. Referring to city planning texts, the city council determined five dwelling units per gross acre is considered the highest density and one dwelling unit as the lowest density. Bahls' proposed development provided for anywhere between 3.5 and 3.7 units per gross acre. The proposed development would have created a much greater density of homes than surrounding subdivisions. The size of the proposed development is approximately 300 homes. At the time of the Bahls' proposal there were approximately 700 homes in the City of Asbury. Bahls' development would increase the number of total homes in the City by thirty percent. The city council also considered the relative size of the proposed lots. The proposed size was considerably smaller than that of existing lots. The area of each new lot would be 5000 square feet whereas the housing units currently in the area are required to have 7000 square foot lots. *See* ordinance § 3–5.6.

The council considered evidence regarding the estimated cost of the new housing units and the planned size of streets in the proposed development. Each new unit would cost on average $32,500 in a neighborhood where nearly all 700 homes were

estimated to be worth at least $100,000. The record reflects most of the homes surrounding the proposed development were valued at over $200,000. The Bahls' proposed development included streets twenty-eight feet wide in violation of the thirty-one foot minimum requirement in the ordinance.

In general, the city council had ample evidence to consider regarding the ultimate result of constructing the new housing units. The impact of putting 300 housing units on 110 acres of land would be significant. It would create substantial additional traffic and noise in the area. The size of the development would directly impact the City's fire, police, water, and sewer services. Moreover, the city council was told of claims of the Bahls' generally poor record of maintenance on their properties. As the Bahls proposed to complete the project in seven phases, the council could have found the project might ultimately fail and be left partially completed.

Bahls' application was denied based upon the same factors the city council would apply to all other zoning applications. The city council concluded the proposed development violated the ordinance and comprehensive zoning plan. In doing so, the city council determined that rezoning the Bahls' property was not in the best interests of the community. 101A C.J.S. *Zoning & Land Planning* § 62, at 246 (1979). Because the reasonableness of the denial of the rezoning application is fairly debatable, the city council's discretion in this matter is controlling. *See Perkins*, 636 N.W.2d at 67. I would reverse the district court's ruling that the Asbury zoning ordinance violates section 414.28A.